CASE 22—BASTARDY—JUNE 16.

## Lewis vs. Commonwealth.

APPEAL FROM UNION CIRCUIT COURT.

1. The amendment of March 1, 1860, to section 20 of the Civil Code, giving circuit courts appellate jurisdiction of the judgments and final orders of the county courts in cases of bastardy, is not repealed by section 12 of the act of June 3, 1865, to reduce into one the bastardy laws of this Commonwealth. (*Myers' Sup.*, 65.) Although the latter act might be construed as authorizing an appeal directly from the county court to the court of appeals.

2. Bastardy proceedings are not authorized in a case where the putative father, the mother, and the child, were all slaves at the time of the birth of the child.

3. The acts of the Legislature have not attached responsibilities to the freedman for his acts as a slave.

SPALDING & CHAPEZE and

W. P. D. BUSH,                                          For Appellant,

CITED—

*Civil Code, sec.* 20; *Amendment of March* 1, 1860.

*Revised Statutes, sec.* 2, *chap.* 6.

*Act of Feb.* 17, 1858.

*Act of March* 3, 1860, *Myers' Sup.*, 61.

*Act of June* 3, 1865, *Myers' Sup.*, 62.

*Act of Feb.* 14, 1866, *Myers' Sup.*, 735.

*MSS. Opn., June term,* 1866; *O'Donoghue vs. Akin.*

John Rodman, Attorney General, and
Lysander Hord,                                    For Appellee,
                          CITED:—
   4 *Met.*, 71; *Commonwealth vs. Taphorn.*
   *Act of March* 1, 1860, *Myers' Code, p.* 8.
   *Sec.* 12, *Act of June* 3, 1865.
   *Act of Feb.* 14, 1866.

JUDGE WILLIAMS DELIVERED THE OPINION OF THE COURT:

Appellant, a freedman, having been adjudged by the
Union county court, at its July term, 1867, to be the
father of the illegitimate freed child of Julia Martin,
a freed woman, which was born December 27, 1864,
when both the mother and putative father were slaves,
and required to pay fifty dollars annually for its support,
until it should arrive at ten years of age, appealed to
the circuit court, which affirmed the county court judg-
ment, and from which he prosecutes an appeal to this
court.

. The amendment of March 1, 1860, to section 20, Civil
Code, enacted, that " the circuit courts of this Common-
wealth shall have appellate jurisdiction of the judgments
and final orders of the county courts in cases of bas-
tardy."

By section 12 of the act of June 3, 1865 (*Myers' Sup-
plement, p.* 65), " to reduce into one the bastardy laws of
this Commonwealth," and which repeals " all acts or
parts of acts inconsistent" with it, provides, that " if
the adjudged father shall appeal or prosecute a writ of
error, with a supersedeas to the court of appeals from
the decision of the county court, and the decision shall
be affirmed, the sureties in the appeal or supersedeas
bond shall be liable for all the father had been adjudged
to pay, and also the costs and ten per centum damages

on the appeal; and the court of appeals shall allow
a· fee to the Attorney General, if he shall defend the
appeal, not exceeding twenty-five dollars, which shall
be taxed as costs in the case in said court." On a
strict analysis of this section, it is apparent that its
main object was to fix a standard of liability on the
appeal and supersedeas bond, not before recognized by
the previous statutes, and not to change or alter the
jurisdiction of the courts; and though it might be con-
strued as authorizing an appeal directly to this court
from the county court, yet it should not be construed
as repealing the amendment to section 20, Civil Code,
as the two enactments are not inconsistent, and may
be construed to stand together, and as authorizing the
dissatisfied party to appeal to the circuit court, notwith-
standing the later enactment; and this construction be-
comes the more potent when it is considered that an
appeal is provided by the enactment of June 3, 1865, to
the adjudged father alone; hence, if it be construed as
repealing all former laws, the Commonwealth would
have no appeal; so, if the adjudged father can appeal
to this court directly, still the Commonwealth must pros-
ecute her appeal to the circuit court.   We therefore
construe these enactments as not inconsistent, but still
in force.

   This brings us to the radical question in the case,
whether a slave father, who shall have a slave child by
a slave mother, without lawful wedlock, can be held
responsible, after they are all freed by constitutional
amendment, for the support of such child as a bastard.

   In slavery, there was no such thing as lawful wedlock,
under our laws, nor legal responsibility for the rearing of
the children by either parent.   The children, like the
parents, belonged to the master, who was entitled to

their labor and production, and responsible for their food and clothing and shelter, so that neither the parents nor children could become a public burden; hence no laws regulating the relative rights of husband and wife, or parent and child, existed as to slaves; nor, indeed, could even free persons of color sue out a warrant in bastardy against a free man of color, as the statutes regulating this authorized free *white* mothers alone to make the necessary affidavits and sue out the proper warrant. And thus stood our laws down to the enactment of February 14, 1866 (*Myers' Supplement*, 735), to "confer certain civil rights upon negroes and mulattoes," which, in section 2, provides: "That any negro or mulatto may, by affidavit, charge any person with any criminal offense against his or her person or property, or the person or property of another. * * * * And it shall be lawful for any negro or mulatto, in any action, suit, or controversy, pending or to be instituted, in any court of law or equity of this State, in which they are parties interested, to make all needful and lawful affidavits as shall be necessary for the institution, prosecution, or defense of such action, suit, or controversy."

In the case of *Frances vs. Commonwealth*, this court, December 4, 1867, decided, that this statute, in its general scope and intendment, authorized a freedwoman to sue out a warrant in bastardy against a freedman who she charged with being the father of her illegitimate child, born after both the mother and putative father became free; and that she was a competent witness under our statutes regulating the competency of witnesses.

But, in this case, the rights and responsibilities attached when the adjudged father and the mother were free persons.

Lewis vs. Commonwealth.

Whilst the statute of February 14, 1866, conferred remedies and means to secure the rights of free persons of color, it was never meant to create rights, nor to attach rights by retroactive operation when no civil rights nor legal responsibilities existed. In other words, it never meant to attach responsibilities to the freedman for his acts as a slave when no responsibilities attached to him as such.

It is the birth of an illegitimate child that attaches responsibilities to the putative father for its support. Of course, if it should not be born alive, no responsibility would attach; and if so born, and should die before any warrant in bastardy should be sued out, no responsibility could then be enforced; for the very objects of the proceeding would not exist, to-wit: the support of the child.

When this child was born, the owner, and not the putative father, was responsible for its support. Afterwards, it and its parents were freed; but no statute has provided that the slave putative father shall be responsible for the support of his illegitimate slave child, and it would be going much further than the Legislature has ever manifested any intention to construe these statutes, conferring civil rights and the right to testify on freed persons, to retroact so as to make the putative slave father responsible for his illegitimate children; for, legally speaking, all persons born in slavery were born out of lawful wedlock. Such a thing as legitimate marriage of slaves was unknown to our laws. The Legislature has manifested other remedies—first, by authorizing the county courts to bind out all freed children where their parents are not supporting them; secondly, by assessing a tax upon the free colored male population of a given age, all of which is husbanded to support their indigent poor and school their children, and not a dollar of which is to go towards

supporting the State government or defraying the county expenses.

The amendment to the United States Constitution abolished all interest of the owner in his slave, and with its abrogation relieved him from all responsibility to support the freed slave; but this in nowise shifted the responsibility of support on to the shoulders of the legally irresponsible putative father, nor has any of our State statutes done so.

Our conclusion, therefore, is, that there is no responsibility on the part of the putative father for the support of a child born a slave; especially is there no such responsibility on a slave father since freed.

Wherefore, the judgment of the circuit court is reversed, with directions to reverse the judgment of the county court, and to direct it to dismiss the proceedings absolutely—Judge ROBERTSON dissenting as to the responsibility of appellant.